## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JAZMINE MONAY MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-22-00665-JD |
| | ) | |
| OKLAHOMA COUNTY CRIMINAL | ) | |
| JUSTICE AUTHORITY; BOARD OF | ) | |
| COUNTY COMMISSIONERS FOR | ) | |
| OKLAHOMA COUNTY; and | ) | |
| STEVEN BLAKE BREWER, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Before the Court are two motions to dismiss Plaintiff Jazmine Monay Miller's Complaint [Doc. No. 1]. Defendant Board of County Commissioners for Oklahoma County ("the Board") filed a Motion to Dismiss [Doc. No. 20]. Miller filed a Response in Opposition [Doc. No. 27], to which the Board replied [Doc. No. 29]. Defendant Oklahoma County Criminal Justice Authority ("OCCJA") filed a Special Appearance and Motion to Dismiss [Doc. No. 21], to which Miller filed a Response in Opposition [Doc. No. 28].[1] The Board moves to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and (b)(6); OCCJA moves to dismiss the Complaint under Rule 12(b)(6). For the reasons stated below, the Court denies the motions.

---

[1] In citing the parties' briefing in this order, the Court uses page numbering from the CM/ECF stamp across the top of district court docket filings.

I.    **BACKGROUND**

Accepting as true the well-pleaded facts in the Complaint and drawing all reasonable inferences in Plaintiff's favor, the events giving rise to this suit took place while Ms. Miller was a pretrial detainee housed at the Oklahoma County Jail. Compl. ¶ 9. She had been arrested pursuant to a warrant, and a court had determined there was probable cause for her arrest. *Id.* at 3 n.1.

On the evening of August 6, 2020, Ms. Miller left her cell without permission to take a shower. *See id.* ¶¶ 10–11, 43. A female officer ordered Ms. Miller to return to her cell, but Miller refused. *Id.* ¶ 11. The female officer reported the incident to Defendant Steven Blake Brewer, a lieutenant and supervisor at the jail. *Id.*

Lieutenant Brewer then went to the shower area, where he punched Ms. Miller several times in her face and body while "she was unclothed and defenseless inside of the shower stall." *Id.* ¶ 12. In addition, Lieutenant Brewer "struck Ms. Miller in the body with his knee and also applied O.C./pepper spray in Ms. Miller's face." *Id.* ¶ 13. In connection with this incident, Lieutenant Brewer was charged in state court with criminal assault and battery. *Id.* ¶ 25 (citing *State v. Brewer*, Case No. CM-2020-3272 (Okla. Cnty., Okla.)). Defendants later notified the Court that the state criminal proceedings against Lieutenant Brewer were dismissed on January 19, 2023, during a docket call. [Doc. No. 33 at 1].[2]

_____

[2] The Complaint cites the case number for the criminal case against Brewer as CM-2020-3272, but the notice reports the case as CM-2020-3271. Neither case number

Miller filed this action on August 5, 2022, raising a single § 1983 claim under the Fourteenth Amendment against Lieutenant Brewer, the Board, and OCCJA. Compl. ¶¶ 59–69. Miller alleges that Lieutenant Brewer violated the Due Process Clause of the Fourteenth Amendment by responding to her "passive resistance" with "violent force . . . [that] was excessive and objectively unreasonable." *Id.* ¶¶ 15, 17–18. Miller further alleges that official policies or customs of the Board and OCCJA caused this constitutional violation. *Id.* ¶ 28. Thus, Miller argues, the Board and OCCJA are liable for Lieutenant Brewer's violation of Miller's constitutional rights because they maintained such policies or customs, "in spite of their known and obvious inadequacies and dangers," with deliberate indifference to the consequences of those policies and customs. *Id.* ¶ 68.

For relief, Miller requests compensatory damages in excess of $75,000 "with interest accruing from the date of filing suit," as well as "punitive damages for Lieutenant Brewer's reckless disregard of [Miller's] federally protected rights, with interest accruing from the date of filing suit." *Id.* at 15. Miller further requests costs, attorneys' fees, and "such other relief as is deemed just and equitable." *Id.*

## II.    <u>LEGAL STANDARDS</u>

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction takes one of two forms: a "facial" or "factual" attack. *Pueblo of Jemez v. United States*, 790 F.3d

---

shows a record of the parties or proceedings on the publicly available Oklahoma State Courts Network, www.oscn.net (last accessed Aug. 12, 2025).

1143, 1148 n.4 (10th Cir. 2015) (quoting *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)). A facial attack questions the sufficiency of the complaint's allegations. *Id.* In reviewing a facial challenge, the Court must accept the well-pleaded allegations in the complaint as true. *Id.* In contrast, a factual attack challenges the underlying facts upon which subject matter jurisdiction depends, so a district court may not presume the truthfulness of the complaint's factual allegations. *Id.* When considering a factual attack, the Court may allow affidavits or other documents and conduct a limited evidentiary hearing to resolve disputed jurisdictional facts. *Id.*

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Under this standard, the Court accepts all well-

---

[3] Miller argues that "after *Twombly* and *Iqbal*, courts have applied a laxed standard when reviewing municipal liability claims at the motion to dismiss stage." [Doc. No. 27 at 9; Doc. No. 28 at 10]. However, Miller provides no binding authority that supports this proposition. The Tenth Circuit has "explained that nothing in *Iqbal* changed the 'longstanding interpretation' of § 1983's standards for imposing municipal liability." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010)). "Determining whether a complaint states a plausible claim [is] a context-specific task," *Iqbal*, 556 U.S. at 679, so, as in any case, the Court will consider the context of this claim (specifically, that it is a § 1983 claim raised under a theory of municipal liability) when assessing whether Miller has stated a claim upon which relief can be granted. But the Court is not persuaded that a lax pleading standard necessarily applies to municipal liability claims.

pleaded facts as true and views them in the light most favorable to the nonmoving party. *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the Court must "draw on its judicial experience and common sense" to determine whether a complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 678–79. "In other words, dismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104–05 (10th Cir. 2017).

## III.    ANALYSIS

### A.    At the pleading stage, the Board and OCCJA are both proper defendants to this action.

As a threshold matter, both the Board and OCCJA argue that they are not proper defendants to this action. The Board argues that Miller lacks standing to sue the Board because it "has no express statutory authority to act in areas of jail operations," so "no injury of Plaintiff can be shown to be traceable to the acts or omissions of [the] Board." [Doc. No. 20 at 14]. According to the Board, OCCJA is responsible for the daily operations of the jail, so the Board argues that OCCJA is the proper defendant to this action instead of the Board. [Doc. No. 29 at 5]. The Board further characterizes Miller's allegations against it as amounting to "funding decisions" that are too attenuated to be fairly traceable to the Board. [Doc. No. 20 at 15–17].

For its part, OCCJA argues that it "is not a person, corporation, partnership, or unincorporated association," so it lacks capacity to be sued under Oklahoma law.[4] [Doc. No. 21 at 2]. OCCJA asserts that it "is an independent entity with regard to the duties of operating and maintaining the Oklahoma County Detention Center," but "it is an agency of Oklahoma County and the [Board] for purposes of liability." *Id.* at 3.

Essentially, these arguments amount to "mutual finger-pointing," with the Board arguing that OCCJA is the proper defendant to this suit and OCCJA arguing that the Board is the proper defendant. *Bond v. Okla. Cnty. Crim. Just. Auth.*, No. CIV-23-05-D, 2023 WL 2878772, at *2 n.1 (W.D. Okla. Apr. 10, 2023) ("This mutual finger-pointing further suggests that it would be inappropriate at this stage to rule as a matter of law that the OCCJA is not a proper defendant.").

### 1.    Miller has standing to sue the Board.

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (quoting U.S. Const. art. III, § 2, cl. 1). The Supreme Court's "'cases have established that the irreducible constitutional minimum of standing contains three elements': injury

---

[4] A party raising the issue of its capacity to sue or be sued "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." Fed. R. Civ. P. 9(a)(2). "[I]f the lack of capacity, authority, or legal existence issue appears on the face of the pleadings or is discernible therefrom, the issue can be raised by a motion to dismiss for failure to state a claim for relief." 5A *Wright & Miller's Federal Practice & Procedure* § 1294 (4th ed. 2025). Because the issue of OCCJA's capacity to be sued is discernible from the face of the Complaint, OCCJA's challenge is properly raised in its 12(b)(6) motion.

in fact, causation, and redressability." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The plaintiff, as the party invoking federal jurisdiction, bears the burden of satisfying these elements, which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*

The Board does not dispute that Miller has alleged that she suffered a redressable injury, and the Court is satisfied that her alleged physical injuries are concrete, particularized injuries that could be redressed through the monetary damages she seeks. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.").

The Board's standing challenge hinges on the second element of standing: causation. This element requires "a causal connection between the injury and the conduct complained of," meaning that "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation modified). "Article III's causation requirement demands 'something less than the concept of "proximate cause,"'" but it "does at least require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (quoting *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263,

1273 (11th Cir. 2003)). For an injury to be fairly traceable to the defendant, the defendant's actions need not be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Although "it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Id.* (citation modified).

The Board first argues that "no injury of Plaintiff can be shown to be traceable to the acts or omissions of [the] Board as a matter of law" because "the Board has no express statutory authority to act in areas of jail operations." [Doc. No. 20 at 14]. Although it is presented as an issue of standing, this argument does not actually challenge Miller's standing to sue. As the Supreme Court has made clear, "[t]he standing inquiry focuses on whether the *plaintiff* is the proper party to bring this suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (emphasis added); *see also All. for Hippocratic Med.*, 602 U.S. at 379 ("Article III requires a plaintiff to first answer a basic question: '"What's it to you?"'") (citation omitted). The Board does not argue that Miller, as a plaintiff, is not a proper party to this suit. Instead, the Board argues that it is an improper defendant to this suit because it is not responsible for the day-to-day operations of the jail. This "argument is better understood as a well-disguised challenge to the legal merits of [Miller's] case, not as a challenge to [her] standing to pursue it." *Davis v. Wells Fargo*, 824 F.3d 333, 347 (3d Cir. 2016). "Like all merits arguments, the question of whether a plaintiff has sued the correct defendant should ordinarily be addressed at the pleading stage by affording the plaintiff the protections provided by Rule 12(b)(6)," not in a jurisdictional challenge

to standing raised under Rule 12(b)(1). *Id.* Therefore, the Court will take up this argument about the Board's involvement in jail operations when it addresses whether Miller has stated a claim for municipal liability against the Board, not in a threshold challenge to Miller's standing.

Next, the Board argues that Miller "alleges her injuries are the result of systemic deficiencies of the [jail] dating back nearly 30 years," so the Board's conduct is not fairly traceable to Miller's injuries. [Doc. No. 20 at 15]. This argument lacks merit. Miller alleges that in 2008, the U.S. Department of Justice ("DOJ") issued a report detailing the "woefully inadequate supervision and staffing at the Jail," and following that report, "[f]rom at least 2008 to present, [the Board] has failed to provide sufficient oversight and funding of [the] Jail." Compl. ¶¶ 36, 38. "As a matter of practice," Miller alleges that Oklahoma County dealt with the problems at the jail "not by increas[ing] funding, staffing, and training, but by fostering an environment where excessive use of violent force was tolerated and encouraged as a way to 'control' the detainee/inmate population." *Id.* ¶ 43. The Board paints these allegations as complaining of decades-old funding decisions that could not plausibly have caused Miller's injury. [Doc. No. 29 at 2]. But Miller points to *ongoing* inadequacies in the funding, staffing, and oversight of the jail, and she alleges that the Board's refusal to address these inadequacies fostered an environment in which the kind of excessive force she allegedly suffered was "tolerated and encouraged." Compl. ¶ 43. These allegations point to a plausible chain of causation linking the Board's conduct to Miller's injury. Although Miller alleges that Lieutenant

Brewer directly caused her injuries, she has plausibly alleged that the Board's decisions impacted the conduct of Brewer and other jail officials.

Thus, the Court concludes that Miller has plausibly alleged that she suffered a redressable injury that is fairly traceable to the Board's conduct and decision-making. She therefore has satisfied the elements of constitutional standing at the pleading stage.

### 2. OCCJA is a suable entity.

Under Federal Rule of Civil Procedure 17(b)(3), "[c]apacity to sue or be sued" for parties that are not individuals or corporations is determined "by the law of the state where the court is located." Oklahoma law provides that, "[e]xcept as otherwise provided by law, any person, corporation, partnership, or unincorporated association shall have capacity to sue or be sued in this state." 12 Okla. Stat. § 2017(B). OCCJA argues that, as a public trust, "it is an agency of Oklahoma County and the [Board] for purposes of liability." [Doc. No. 21 at 3]. However, under Oklahoma law, public trusts are presumed to "[e]xist as a legal entity separate and distinct from the settlor and from the governmental entity that is its beneficiary." 60 Okla. Stat. § 176.1(A)(2).

The Tenth Circuit has entertained § 1983 claims against Oklahoma public trusts, reasoning that, under Oklahoma law, a public trust is a "political subdivision" that "stands on equal footing with a municipality, school district, and other similar governmental units." *Beedle v. Wilson*, 422 F.3d 1059, 1065 (10th Cir. 2005) (citing 51 Okla. Stat. § 152(8)(a)–(d) (current version at 51 Okla. Stat. § 152(11)(a)–(d)) (holding that a public trust hospital is a suable entity in a § 1983 action); *see also Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 653–54 (10th Cir. 2017) (addressing the merits of a

§ 1983 municipal liability claim against the McCurtain County Jail Trust without commenting on the jail trust's capacity to be sued). Oklahoma's federal district courts have followed suit and resolved a number of § 1983 cases raised against jail trusts. *Bond v. Okla. Cnty. Crim. Just. Auth.*, No. CIV-23-05-D, 2023 WL 2878772, at *2 (W.D. Okla. Apr. 10, 2023) (collecting cases).

OCCJA does not cite any contrary authority establishing that Oklahoma public trusts lack capacity to be sued. OCCJA discusses three cases from federal district courts in Oklahoma and argues that these cases demonstrate that a jail trust is an agency of the county for purposes of liability rather than a separate suable entity. [Doc. No. 21 at 3–4] (first citing *Chichakli v. Samuels*, No. CIV-15-687-D, 2016 WL 2743542 (W.D. Okla. May 11, 2016); then citing *Folts v. Grady Cnty. Bd. of Cnty. Comm'rs*, No. CIV-15-996-M, 2017 WL 11557921 (W.D. Okla. July 25, 2017); and then citing *Hill v. Okmulgee Cnty. Crim. Just. Auth.*, No. CIV-18-394-SPS, 2019 WL 11000375 (E.D. Okla. Apr. 18, 2019)). However, none of these cases held that a jail trust cannot be sued. Instead, the courts in each of these cases entertained claims against both a county and a jail trust, declining to dismiss either as an improper party.

In short, Tenth Circuit precedent and persuasive authority have held that an Oklahoma public trust is a suable entity in a § 1983 suit, and OCCJA has not presented any authority stating otherwise. Thus, the Court declines to dismiss OCCJA as an improper party at this stage of the proceedings.

**B.      Miller has stated a municipal liability claim against OCCJA and the Board under the Fourteenth Amendment.**

Miller has sued Lieutenant Brewer under 42 U.S.C. § 1983, alleging that he violated the Fourteenth Amendment by using "excessive and objectively unreasonable" force against her.[5] Compl. ¶ 61. Miller also brings this claim against OCCJA and the Board, asserting that the "acts of excessive force by Lieutenant Brewer are causally connected with customs, practices, and/or policies which Oklahoma County/OCCJA/[the Board] promulgated, created, implemented, and/or possessed responsibility for." *Id.* ¶ 65. OCCJA and the Board both move to dismiss this claim, arguing that Miller has not sufficiently pleaded that a policy or custom of either the Board or OCCJA caused Miller's constitutional injury. [Doc. No. 20 at 18–25; Doc. No. 21 at 6–10].

To bring a § 1983 claim against either the Board or OCCJA, Miller must satisfy the elements of a municipal liability claim established by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The suit against the Board functions as a suit against Oklahoma County. *See* 19 Okla. Stat. § 4 ("In all suits or proceedings by or against a county, the name in which a county shall sue or be sued shall be, 'Board of County Commissioners of the County of _____,' . . . ."). And the Tenth Circuit has assessed

---

[5] Because Miller was a pretrial detainee when Lieutenant Brewer allegedly used excessive force against her, her claim is properly raised under the Fourteenth Amendment rather than the Fourth or Eighth Amendment. *Colbruno v. Kessler*, 928 F.3d 1155, 1162 (10th Cir. 2019); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (explaining that to succeed on an excessive force claim raised under the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable").

§ 1983 claims against an Oklahoma jail trust under municipal liability standards. *See Rife*, 854 F.3d at 653–54; *see also* 51 Okla. Stat. § 152(11)(d) (defining "political subdivision" for purposes of the Oklahoma Governmental Tort Claims Act to include "a public trust where the sole beneficiary or beneficiaries are a city, town, school district or county").

"Proper analysis" of a § 1983 claim asserted against a municipality requires the Court to consider: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [county] is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). Here, neither the Board nor OCCJA disputes that Miller has stated a claim for an underlying constitutional violation against Lieutenant Brewer. Thus, their challenge hinges on whether either entity is responsible for that violation.

To establish a county, municipality, or jail trust's liability for a constitutional violation, a plaintiff "must identify 'a government's policy or custom' that caused the injury" and allege "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (quoting *Monell*, 436 U.S. at 694). In short, "[t]o state a claim against the County, the plaintiffs must allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020). Under these standards, "a municipality can be found liable under § 1983 only where the municipality

*itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "*Respondeat superior* or vicarious liability will not attach under § 1983." *Id.*

> For the first element, an official policy or custom can take many different forms.
>
> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010)).

To satisfy the second element, causation, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Rather, "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* In other words, a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* Moreover, "the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider*, 717 F.3d at 770 (quoting Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 7.12[B] (2013)). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be

applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405.

For the third element, Miller must plausibly allege that the Board and OCCJA acted with deliberate indifference. Deliberate indifference "is a stringent standard of fault, requiring [allegations] that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410. This "standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Notice can be shown by alleging "the existence of a pattern of tortious conduct" or that "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.* at 1307–08 (quoting *Brown*, 520 U.S. at 409).

Turning to the first element, Miller's claim against the Board and OCCJA is premised on two alleged policies or customs. First, Miller alleges that since the jail's inception in 1991, it has been plagued with "[o]vercrowding, under staffing, [and] inadequate security and supervision." Compl. ¶ 35. "As a matter of practice," Miller alleges, Oklahoma County "attempted to deal with this problem, not by increas[ing] funding, staffing and training, but by fostering an environment where excessive use of violent force was tolerated and encouraged as a way to 'control' the detainee/inmate population." *Id.* ¶ 43. She also alleges a widespread "practice of using excessive violent force to quell passive resistance" at the jail. *Id.* ¶ 32. Miller points to prior instances of

jail officials using excessive force on detainees and reports issued by the DOJ, National Institute of Corrections, and an outside consultant to allege that the Board and OCCJA were on notice that their policies and customs put detainees like Ms. Miller at a substantial risk of harm. *Id.* ¶¶ 29–32, 36–39, 46–54. Second, Miller alleges a failure to train and supervise officers at the jail "with respect to, *inter alia*: use of force, de-escalation, the use of force continuum, appropriate use of force in a correctional setting, use of force on a detainee in handcuffs, cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement." *Id.* ¶ 55.

OCCJA argues that "the Complaint fails to show a widespread pattern of similar misconduct in order to identify a custom which can be attributed to the OCCJA, nor did the Complaint provide facts to support that the misconduct in question was approved by the OCCJA." [Doc. No. 21 at 8]. Likewise, the Board asserts that Miller has not alleged an informal custom because the Complaint does not describe "continuing, widespread patterns of similar misconduct" or "tacit approval of this type of misconduct." [Doc. No. 20 at 21]. According to the Board, Miller "has provided insufficient information regarding duration, frequency or consistency of other similar instances to plausibly suggest an unconstitutional policy or custom." [Doc. No. 29 at 9].

Although, from the Court's perspective, this case presents a close call, Plaintiff's allegations are sufficient to show an informal custom at the pleading stage.[6] Specifically,

---

[6] Because Miller has sufficiently alleged an informal custom of using excessive force, the Court does not address her second potential basis for a *Monell* claim, i.e., failure to train and supervise officers.

Miller has plausibly alleged an informal custom of jail officials using excessive force against detainees who, like Ms. Miller, leave their cell without authorization to shower or use the restroom. Miller alleges that in a 2008 report, the DOJ "found woefully inadequate supervision and staffing at the Jail," as well as "overcrowding and a high rate of inmate assaults and deaths." Compl. ¶ 36. Since issuing the report, the DOJ has also identified "an inordinately high risk of violence due to [an] inability to properly supervise." *Id.* ¶ 37. The Tenth Circuit has previously concluded that reports identifying recurring issues with the operation of a jail can show an official policy or custom of providing deficient medical care at a jail. In *Burke v. Regalado*, the court concluded that the Tulsa County sheriff, who was sued in his official capacity, "furthered a 'policy or custom' of deficient medical care at the jail characterized by inadequate training, understaffing, and chronic delays." 935 F.3d 960, 1001 (10th Cir. 2019) (citation omitted). The evidence showing the existence of such a policy or custom included reports that the jail was understaffed and "jail personnel failed to timely address or follow-up on inmates' medical issues." *Id.* at 999.

Miller alleges a pattern of jail officials employing excessive force against detainees who have left their cells without authorization. For instance, Miller alleges that in May 2019, just over a year before her encounter with Lieutenant Brewer, another detainee named Dakota Simco left his cell without authorization to use the restroom and resisted a command to return to his cell. Compl. ¶¶ 29, 43. Brewer confronted Simco while Simco was on the toilet, and Simco asked Brewer for more time to finish using the

17

restroom. *Id.* ¶ 29.[7] Brewer counted to three and then handcuffed Simco. *Id.* When Simco stood up, Brewer "struck Simco in the head with a closed fist while holding his handcuffs." *Id.* ¶¶ 29–30. Simco fell against the wall, and Brewer "struck him a second time in his ear as he fell to the floor." *Id.* ¶ 30. "Simco required 12 staples in his scalp to close the wounds." *Id.* According to the Complaint, Brewer was not disciplined for this encounter "until after the incident involving Ms. Miller came to light and was forwarded to the District Attorney." *Id.* ¶ 31.

Although the Complaint does not describe other similar incidents with the same level of detail as the "Simco incident," Miller does allege that jail officials used excessive force against detainees in other similar situations. Miller alleges that "[f]our (4) other detention officers have been charged criminally for uses of excessive force on inmates who left their cells to shower or use the toilet without permission." *Id.* ¶ 46. According to the Complaint, the DOJ required Oklahoma County to fix the faulty locks in 2008, but by 2019, only one-third of the 1,200 cells had new locking mechanisms, which allowed detainees or inmates to roam the jail unsupervised and leave their cells without permission. *See id.* ¶¶ 43–44. Even "after the Simco and Miller incidents, it was publicly reported that . . . it would cost an additional $3.8 million to completely remedy the faulty cell door/lock deficiency" at the jail. *Id.* ¶ 45.

Miller further alleges that "[t]hree former detention officers face misdemeanor charges of cruelty for placing detainees in a 'standing stress position,' a well-known

---

[7] At the time of this incident, Brewer was a Sergeant. *See id.*

'enhanced interrogation' or torture tactic, and forcing them to listen to the children's song 'Baby Shark'. . . . as a form of discipline for inmates who left their cells." *Id.* ¶ 47. Specifically, one "['Baby Shark'] victim was singled out for punishment after he rigged the old, faulty lock in his cell so he could walk freely around the jail pod, shower and use a toilet with more privacy than the one in his shared living area." *Id.* ¶ 48. Taken together, these allegations describe several instances of officers at the jail—including Brewer himself—using excessive force to respond to detainees who had left their cells to either shower or use the restroom.

The Tenth Circuit has noted that "[i]n attempting to prove the existence of . . . a 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). For example, in *Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 877 (10th Cir. 1993), the plaintiffs alleged a municipal informal custom of police officers harassing anti-abortion protestors, and they sought to prove the existence of this custom by introducing evidence of several other protestors who had been harassed by police in similar incidents that took place both before and after the incident giving rise to the lawsuit. According to the Tenth Circuit, "[t]he evidence submitted by plaintiffs would support an inference of considerably more than one instance of conduct, which alone may not prove a custom or policy." *Id.* at 878. Thus, the court held, "when all of the plaintiffs' evidence is considered, it is sufficient, if believed, to support a finding that the City and the Police Department followed a policy or custom resulting in violation of plaintiffs' constitutional

rights." *Id.* Here, as in *Cannon*, Miller has alleged that several similarly situated individuals were mistreated by officials at the Oklahoma County Jail in a manner similar to the way Miller was allegedly mistreated by Lieutenant Brewer.

Considering Miller's allegations regarding prior incidents of guards using excessive force against similarly situated detainees and Miller's allegations regarding the 2008 DOJ report, the Court concludes that Miller has sufficiently pleaded the existence of an informal custom amounting to a widespread practice of jail officials responding with unreasonable force to detainees leaving their cells without permission. *Cf. Currin v. Okla. Cnty. Crim. Just. Auth.*, No. CIV-23-22-F, 2023 WL 3310173, at *3 (W.D. Okla. May 8, 2023) (concluding that a plaintiff who alleged an informal custom of the use of excessive force at Oklahoma County Jail had "pleaded facts that give rise to a plausible inference of the existence of the alleged informal customs"); *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018) ("[I]t is sufficient under our case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity."); *Velarde v. Bd. of Cnty. Comm'rs of Cnty. of Taos*, 756 F. Supp. 3d 1216, 1222 (D.N.M. 2024) ("The Court finds that Plaintiff's FAC contains sufficient allegations about the County Defendants' informal custom of allowing gross deprivations of civil rights of inmates at TCADC by jail staff using excessive force, which amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.").

Further, the Court concludes that, at the pleading stage, this custom is fairly

attributable to both OCCJA and the Board. According to the Complaint, on August 6, 2020, OCCJA was responsible for the management and daily operations of the jail. Compl. ¶ 2. The Board was "charged with ensuring that the Jail ha[d] adequate funding and resources to provide constitutionally sufficient conditions of confinement." *Id.* ¶ 3.

The Board argues, however, that because it does not manage day-to-day operations at the jail, it "requires mental gymnastics" to conclude that it somehow "foster[ed] an environment where excessive use of violent force was tolerated and encouraged as a way to 'control' the detainee/inmate population." [Doc. No. 20 at 19] (quoting Compl. ¶ 43). The Court disagrees. "While it is true that in appropriate circumstances a board of county commissioners may be dismissed from a § 1983 lawsuit because its policies or customs cannot be shown to be responsible for an alleged constitutional violation, that does not mean that such board can never be a proper party as a matter of law." *Harper v. Woodward Cnty. Bd. of Cnty. Comm'rs*, No. CIV-11-0996-HE, 2014 WL 7399367, at *9 (W.D. Okla. Dec. 29, 2014). Rather, "[d]etermining a party's responsibility for a policy that leads to a federal rights violation involves a fact-specific inquiry." *Id.* For instance, although OCCJA may be responsible for daily operations of the jail, "the county's board of commissioners sets policies, including fiscal policies, that may be implicated in a violation of a county inmate's federal rights." *Id.*; *see also* 2007 Okla. Att'y Gen. 35, ¶ 19 ("[N]ot only is a county required to provide for a jail and fund its operation, regardless of whether the jail is operated by the sheriff or a public trust created for such purpose, it must also give priority to the funding to ensure performance of a [state] constitutional duty [to maintain a jail].").

Miller has alleged that Oklahoma County (through the Board) failed to fund the jail adequately, and she has plausibly linked this deficient funding to an informal custom of using excessive force. For instance, Miller alleges that the County did not provide sufficient funding to repair faulty locks on jail cell doors, and when detainees left their cells as a result, jail officials had a custom of using excessive force to control the detainee population. Compl. ¶¶ 43–45. At the pleading stage, these allegations are sufficient to show that the informal custom of using excessive force on detainees who left their cells is attributable, at least in part, to the Board. Miller has therefore satisfied the first element of a *Monell* claim against both OCCJA and the Board.

As for *Monell*'s second element, Miller has plausibly alleged that this informal custom of using excessive force on detainees who have left their cells was the moving force behind her injury. OCCJA and the Board both argue that Miller has not alleged facts that conceivably show a causal link between either defendant and Miller's alleged injury. [Doc. No. 20 at 24; Doc. No. 21 at 9]. But Miller has plausibly alleged the existence of an informal custom of using excessive force on inmates who have left their cells without authorization and that Lieutenant Brewer used excessive force against her pursuant to this informal custom. This alleged custom is closely related to the alleged violation of Miller's constitutional right to be free from excessive force. Further, Miller has plausibly alleged that OCCJA and the Board have facilitated and exacerbated this custom by understaffing, underfunding, and overcrowding the jail. These allegations suffice to show that this informal custom was the moving force behind Miller's injury.

Lastly, Miller has plausibly alleged that the Board and OCCJA were deliberately indifferent to the known or obvious consequences of this custom. As discussed above, Miller has alleged a pattern of jail officials using excessive force against detainees who leave their cells without authorization to shower or use the restroom. Plaintiff alleges that officers had used excessive force against detainees in such circumstances on several occasions before Miller's encounter with Sergeant Brewer. *See* Compl. ¶¶ 29–31, 46–48. Moreover, Miller alleges that the 2008 DOJ report notified the jail that its inadequate staffing and supervision threatened the safety of detainees in the jail. *Id.* ¶¶ 36–38. Thus, Miller has plausibly alleged that the Board and OCCJA had notice that violations of detainees' federal rights were a highly predictable consequence of the Board and OCCJA's actions (or, more specifically, their failure to act).

Thus, Miller has plausibly alleged each element of a municipal liability claim by stating that an official custom attributable to the Board and OCCJA caused a violation of her constitutional rights and that the custom was maintained with deliberate indifference to a highly predictable constitutional injury.

IV.    <u>**CONCLUSION**</u>

For these reasons, the Court DENIES the Board and OCCJA's motions to dismiss [Doc. Nos. 20, 21].

IT IS SO ORDERED this 12th day of August 2025.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE